UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FLEXIBLE STEEL LACING CO., | ) |
| Plaintiff/Counter-Defendant, | ) ) ) |
| | ) No. 17 C 5540 |
| v. | ) ) |
| | ) Chief Judge Rubén Castillo |
| CONVEYOR ACCESSORIES, INC., | ) ) |
| Defendant/Counter-Plaintiff. | ) ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff/Counter-Defendant Flexible Steel Lacing Co. ("Flexco") brought this action for trade dress infringement and unfair competition. (R. 1, Compl.) Flexco alleges that Defendant/Counter-Plaintiff Conveyor Accessories, Inc. ("CAI") infringed its registered and common law trade dress by promoting and selling conveyor belt fasteners having a non-functional product configuration confusingly similar to that belonging to Flexco. (*Id.* ¶ 2.) Before the Court is CAI's motion for summary judgment of invalidity (R. 71, Def.'s Mot.), and Flexco's motion for partial summary judgment on CAI's declaratory judgment counterclaim and its affirmative defense of unclean hands (R. 80, Pl.'s Mot.). For the reasons discussed below, CAI's motion is granted, and Flexco's motion is denied as moot.

## RELEVANT FACTS

The following facts are undisputed unless otherwise stated. Flexco is an Illinois corporation with its principal place of business in Downers Grove, Illinois. (R. 83-1, Pl.'s Resp. Def.'s SOF ¶ 1.) CAI is a Delaware corporation with its principal of business in Burr Ridge, Illinois. (*Id.* ¶ 2.) Flexco sells rivet hinged fasteners for connecting the ends of conveyor belts together. (*Id.* ¶¶ 6-7.) The Flexco fasteners attach to each of the two ends of a conveyor belt by

inserting rivets through each aperture on the top of the upper surface of the fastener. (*Id.* ¶ 8.) The choice of an appropriate hinged fastener in various operations involves considerations such as the tensile strength of the belts employed and the pulley diameters in the conveyor drive system. (*Id.* ¶ 9.) A fastener is designed to provide strong holding capacity for its particular application without being too thick so as to ensure that it avoids interfering with the pulleys, belt cleaners, and other conveyor belt components. (*Id.*)

To avoid catching on other components, Flexco's fasteners have traditionally been coined or beveled. (R. 83-1, Pl.'s Resp. Def.'s SOF ¶ 36.) In 1997, Flexco modified its fastener from a straight beveled leading edge, to a scalloped leading edge. (*Id.* ¶¶ 10, 35.) Flexco's then-engineer manager Edward Musil was involved in the development of the scalloped leading edge fastener. (*Id.* ¶¶ 34, 35.) At the time, he explained that the "main purpose of a scalloped edge will be to prevent fasteners from getting scraped off by the cleaner."[1] (*Id.* ¶ 35.) He also visited a testing site in 1998 and observed that the scalloped fastener had a "noticeably gentler impact with the various cleaners," than the straight edge one, and that mine personnel believed it would result in longer lives of the conveyor belt splice and cleaner blades. (*Id.* ¶ 38.) Flexco engineers also tested the configuration and determined it performed better or at least equal to its conventional straight leading edge fastener. (*Id.* ¶ 39.) Flexco's president Rick White testified, however, that the reason for introducing the scalloped edge of other fasteners was to differentiate the Flexco

---

[1] The Court finds that the parties' references to this document and several others discussed in this paragraph should not be sealed. Neither the parties' filings nor their exhibits contain trade secrets (or information from which trade secrets could be copied or reverse engineered), privileged information, or other information required to be confidential. *Baxter Int'l v. Abbott Labs.*, 297 F.3d 544, 545 (Although the parties' confidentiality agreement might suffice at the discovery stage, "those documents, usually a small subset of all discovery, that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality.").

product from competition. (R. 90-1, Def.'s Resp. Pl.'s Add'l SOF ¶ 1.) Mr. Musil similarly testified that the scalloped shape was selected because "it looked good."[2] (R. 83-1, Pl.'s Resp. Def.'s SOF ¶ 35.)

In 1997, Flexco filed a patent application with the U.S. Patent and Trademark Office ("USPTO"). (*Id.* at ¶ 10.) The application issued in April 2000 as U.S. Patent Number 6,053,308 ("the '308 Patent"), and expired in September 2017. (*Id.*; R. 71-4, '308 Patent.) Figure 2 of the '308 Patent depicts a belt fastener before riveting the upper and lower plates to a belt:



(R. 83-1, Pl.'s Resp. Def.'s SOF ¶ 11.) The '308 Patent's specification states that the two-rivet fastener as shown in Figures 2 and 4 of the patent is a preferred embodiment.

---

[2] Although Flexco failed to attach the cited page of Mr. White's deposition transcript, CAI does not dispute Flexco's characterization of his testimony. (R. 90-1, Def.'s Resp. Pl.'s Add'l SOF ¶ 1; R. 83-2, White Dep. Tr.)

(R. 105-1, Pl.'s Resp. Def.'s Add'l SOF ¶ 3.) The summary of the invention declares that a "belt fastener using more than two rivets . . . will still fall within the purview of this invention." (*Id.*) The specification describes the known functional benefits of beveling the leading edge of a fastener:

> For improved belt gripping and for a lower lead-in profile for the belt fasteners, it is known to bevel or coin the outboard edges **44** and **46** of hinged fasteners so that the edges of the plates provide a lower profile and grip into the belts when the plates are clamped hereto. The outboard edges **44** and **46** of the present two rivet fastener **14** are similarly beveled for biting into the belt carcass.

(R. 83-1, Pl.'s Resp. SOF ¶ 12; R. 71-4, 308 Patent at col. 10, lns 18-24.)

> Another feature of present belt fasteners that assist in providing good holding power and a low profile fastener attached onto the belt end is that the outer or outboard edge of the plates are generally beveled or coined so that when the plates of the fastener are claimed to the belt surfaces, the sharp edges of the plates will bite into the belt surface.

(R. 83-1, Pl.'s Resp. SOF ¶ 12; R. 71-4, 308 Patent at col. 10, lns 40-45.) The '308 Patent described and claimed in part scalloping the leading edge of the fastener:

> [O]ne problem that has been observed where there are two rivets adjacent the fastener outboard edges such as in the two rivet fastener **14** herein, is that the sinking of the coined edges into the belt **18** for a lower profile of the fastener **14** can be compromised because there is too much plate material spaced from the plate rivet receiving apertures. In this regard, the lower plate **26** of the fastener **14** herein is provided with a scalloped or contoured outboard edge **46** so that it generally follows the contour around the rivet apertures **32** formed in the lower plate **26**. Thus, the lower plate outboard edge **46** includes two outer sections **88** that are curved and meet at an inner oppositely curved section **90** so that the outboard edge **46** generally curves around the circular rivet openings **32**, as best seen in FIGS **2** and **4**.

(R. 83-1, Pl.'s Resp. SOF ¶ 14; R. 71-4, 308 Patent at col. 10, lns 24-39.)

> With such a scalloped edge **46**, there is less plate material spaced from the rivet apertures **32** such as if the edge **46** extended straight across between the outer peaks of the outer curved sections **88**. By scalloping the outboard edge **46**, the bite thereof into the belt carcass **17** is improved when fasteners

4

> are rivet to the belt end **18**. The outboard edge **44** of the upper plate **24** can be similarly scalloped for improved sinking thereof into the belt **18** to provide it with an improved lead in profile for being engaged by scraper blades that clean the belt **18**.

(R. 83-1, Pl.'s Resp. SOF ¶ 14; R. 71-4, 308 Patent at col. 10, lns 40-49.)

> Scalloping the outboard edge **46** of the lower plate **26** provides the further advantage of allowing the fasteners **14** herein to be installed on conveyor belt ends utilizing the installation tool **34** provided by the assignee herein for being employed with five rivet fasteners.

(R. 83-1, Pl.'s Resp. SOF ¶ 14; R. 71-4, 308 Patent at col. 3, ln 64 – col. 4, ln 14.)

The '308 Patent also specifically claimed scalloping the leading edge:

> **3.** The belt fastener of claim **1** wherein the one plate is the upper plate of the fastener with the teeth formed thereon, and the outer edge of at least one of the lower and upper plate is contoured to generally follow the contour around the apertures to reduce the amount of plate material spaced from the apertures so that with the fastener riveted onto the belt end, the contoured edge bites into the corresponding belt surface for a lower profile for the fastener and additional belt gripping and tensile force resistance.

(R. 83-1, Pl.'s Resp. SOF ¶ 14; R. 71-4, 308 Patent at col. 12, lns 24-33.)

Flexco applied for a design patent in 1998 for its scalloped edge fastener, and in April 2000, Patent No. 423,749 issued ("the '749 Patent"). (R. 83-1, Pl.'s Resp. Def.'s SOF ¶ 18; R. 105-1, Pl.'s Resp. Def.'s Add'l SOF ¶ 7.) The details of the claimed design are shown in Figures 1-10 of the '749 Patent. (R. 105-1, Pl.'s Resp. Def.'s Add'l SOF ¶ 8.) Days before expiration of the '749 Patent, Flexco filed six trademark applications, two of which ultimately issued. (R. 83-1, Pl.'s Resp. Def.'s SOF ¶ 20; R. 105-1, Pl.'s Resp. Def.'s Add'l SOF ¶ 14.) Both applications, however, were initially refused based in part on functionality. (R. 105-1, Pl.'s Resp. Def.'s Add'l SOF ¶ 18.)

Flexco's U.S. Trademark Registration No. 4,971,326 ("the '326 Registration") was registered on June 7, 2016. (R. 83-1, Pl.'s Resp. Def.'s SOF ¶ 21; R. 99-1, Def.'s Resp. Pl.'s

SOF ¶ 6; R. 71-10, the '326 Registration.) It describes the trademark as consisting of "a three-dimensional configuration of the curved beveled scalloped upper edge of a metal fastener." (R. 83-1, Pl.'s Resp. Def.'s SOF ¶ 20; R. 99-1, Def.'s Resp. Pl.'s SOF ¶ 6.) A week later, Flexco's U.S. Trademark Registration No. 4,975,848 ("the '848 Registration") issued. (R. 83-1, Pl.'s Resp. Def.'s SOF ¶ 22; R. 99-1, Def.'s Resp. Pl.'s SOF ¶ 7; R. 71-11, the '848 Registration.) According to its description, the trademark consists of a "three-dimensional configuration of a metal fastener with a beveled top edge with a scalloped shape, straight side edges, two rectangular legs, and a curved upside down u-shaped notch between the two legs." (R. 83-1, Pl.'s Resp. Def.'s SOF ¶ 22; R. 99-1, Def.'s Resp. Pl.'s SOF ¶ 7.) Flexco also alleges common law trade dress rights in certain design elements of its fasteners. (R. 83-1, Pl.'s Resp. Def.'s SOF ¶ 23.) Flexco's alleged trade dress is depicted by the solid lines below:



(*Id.*)

In support of Flexco's trademark applications, Flexco had submitted a number of declarations from its then Director of Engineering Gregory Westphall to the USPTO. (*Id.* at ¶ 9.) Flexco did not initially disclose the existence of the '308 Patent to the Examining Attorneys, but instead advised in Mr. Westphall's first declaration that it had not obtained or sought utility patent protection for the product configurations at issue. (R. 105-1, Pl.'s Resp. Def.'s Add'l SOF

6

¶¶ 19, 26; R. 71-14, Westphall Nov. 13, 2014 Decl. ¶ 9.) Flexco later disclosed the '308 Patent after a different Examining Attorney for the USPTO cited it as a ground for refusing registration on one of the other applications based on functionality. (R. 105-1, Pl.'s Resp. Def.'s Add'l SOF ¶ 26.)

Mr. Westphall acknowledged in his first declaration that the fastener has a low and smooth profile and that the shape of the fastener reduces exposure to the cleaner blades, skirt rubber and return idlers, but maintained that it was nevertheless nonfunctional because several alternative designs could achieve the same purpose at no additional cost. (R. 83-1, Pl.'s Resp. Def.'s SOF ¶ 30; R. 71-14, Westphall Nov. 13, 2014 Decl. ¶ 11.)

Mr. Westphall's second declaration further explained that a low profile extends the belt splice life, that the overall shape of the fastener reduces the effects of impact between fasteners and belt cleaners, and contributes to the quality of the fastener by reducing its exposure to cleaner blades, skirt rubber, and return idlers. (R. 83-1, Pl.'s Resp. Def.'s SOF ¶ 31; R. 71-15, Westphall June 11, 2015 Decl.) Nevertheless, Mr. Westphall declared, that alternative configurations would also contribute to the quality of the fastener if properly utilized. (R. 71-15, Westphall June 11, 2015 Decl. ¶ 4(f).) According to Flexco, one such alternative is on the market in China. (R. 90-1, Def.'s Resp. Pl.'s Add'l SOF ¶ 9.) In response to the Examining Attorney's inquiry, Mr. Westphall also declared that although Flexco had considered filing for a utility patent, it had concluded that the overall shape of the goods was not functional, but merely an ornamental design. (R. 71-15 Westphall June 11, 2015 Decl. ¶ 4(y).)

Notices of Publication were issued for the applications on the '326 and '848 Registrations on March 2, and March 9, 2016, respectively. (R. 105-1, Pl.'s Resp. Def.'s Add'l SOF ¶ 31.) The Notices indicated that the applications would be published in the Official Gazette on March 22,

2016, and March 29, 2016 respectively. (*Id.*) On April 25, 2016, Flexco filed a Post-Publication Amendment regarding the application for what would become the '326 Registration, a supplemental declaration of Mr. Westphall, and a copy of the '308 Patent. (R. 99-1, Def.'s Resp. Pl.'s SOF ¶ 9; R. 105-1, Pl.'s Resp. Def.'s Add'l SOF ¶ 32.) On May 4, 2016, Flexco filed a Post-Publication Amendment regarding the application for what would become the '848 Registration, along with a supplemental declaration of Mr. Westphall and a copy of the '308 Patent. (R. 99-1, Def.'s Resp. Pl.'s SOF ¶ 11; R. 105-1, Pl.'s Resp. Def.'s Add'l SOF ¶ 33.) Both supplemental declarations explained that Mr. Westphall was unaware of the '308 Patent, or at least its contents, at the time that he signed his earlier declarations. (R. 105-1, Pl.'s Resp. Def.'s Add'l SOF ¶¶ 36, 37.) Neither Post-Publication Amendment mention another Flexco application, which had been refused in part on a finding of strong evidence of functionality based on the '308 Patent's disclosure of the utilitarian advantages of the scalloped edge. (*Id.* at ¶ 38.)

Flexco marketed its fasteners as featuring a "coined or 'scalloped' edge, allowing them to interface seamless with belt cleaners, pulley lagging, and other conveyor components." (R. 83-1, Pl.'s Resp. Def.'s SOF. ¶ 25.) Some Flexco marketing materials declared, "The scalloped design contributes to improved fastener profile resulting in increased compatibility with belt cleaners and improved cleaner-tip wear." (*Id.* at ¶ 24.) Others explained, "The patented Scalloped Edge™ provides for a lower fastener profile to extend belt splice life and reduce exposure to belt cleaner backs and other conveyor components." (*Id.* at ¶ 27.)

## PROCEDURAL HISTORY

Flexco brought this action on claims of trade dress infringement and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, common law, and the Illinois Uniform Deceptive Trade Practices Act, 815 ILL. COMP. STAT. 510-2. (R. 1, Compl.) This Court has

subject matter jurisdiction pursuant to 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331 and 1338. CAI answered the complaint and asserted counterclaims seeking to cancel the registered marks, and for declaratory judgment of invalidity, unenforceability, and noninfringement. (R. 16, Answer & Countercls.) CAI now moves for summary judgment of invalidity (R. 71, Def.'s Mot. Summ. J.), and Flexco moves for summary judgment on CAI's counterclaim for a declaration that the marks are invalid on the basis of fraud, and its affirmative defense of unclean hands. (R. 80, Pl.'s Mot. Partial Summ. J.) Both Flexco and CAI responded in opposition to their adversary's motion, and both filed replies. (R. 83, Pl.'s Resp.; R. 90, Def.'s Reply; R. 99, Def.'s Resp.; R. 105, Pl.'s Reply.) Flexco also moved to strike certain portions of CAI's reply, or alternatively, to file a sur-reply. (R. 95, Pl.'s Mot. Strike or Surresp.) The Court allowed the sur-reply, and took the motion to strike under advisement.[3] (R. 98, Minute Entry.) Both CAI and Flexco were permitted additional filings on Flexco's partial summary judgment motion. (R. 108, 111, Min. Entries; R. 112, Pl.'s Suppl.; R. 106-1, Def.'s Suppl.)

## LEGAL STANDARD

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a

---

[3] The Court finds that Flexco's response to the complained-of material in CAI's reply adequately responds to any concerns it had raised in its motion to strike. Accordingly, the motion to strike (R. 95) is denied.

reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014) (quotation omitted). In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015) (quotation omitted).

Under Rule 56, the movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* (quotation omitted). If the movant carries this burden, the nonmovant "must make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (quotation omitted). The nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [its] favor." *Id.* (quotation omitted). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). "[S]peculation and conjecture" also cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). "[O]nly disputes that could affect the outcome of the suit under governing law" will preclude summary judgment. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (quotation omitted).

## ANALYSIS

### I. Principles of Trade Dress

The Lanham Act protects trade dress, even if it is not registered, and authorizes civil actions against infringers provided the trade dress is not functional. *See* 15 U.S.C.

§ 1125(a); *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000). "[P]atent law alone protects useful designs from mimicry; the functionality doctrine polices the division of responsibilities between patent and trademark law by invalidating marks on useful designs." *Jay Franco & Sons, Inc. v. Franek*, 615 F.3d 855, 857 (7th Cir. 2010). Thus, the functionality doctrine seeks to promote competition by preventing trademark law from inhibiting legitimate alternatives by allowing a producer to control a useful product feature. *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 169 (1995).

As to unregistered alleged trade dress, the party seeking protection bears the burden of proving that its dress is non-functional. 15 U.S.C. § 1125(a)(3); *TrafFix Devices Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 32 (2001). On the other hand, registration of a trademark creates a rebuttable presumption of validity that puts the initial burden of proof on the party seeking to invalidate the registered mark. *Georgia-Pacific Consumer Prods. LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 727 (7th Cir. 2011). The presumption, however, "evaporates as soon as evidence of invalidity is presented." *Id.* (internal quotation omitted).

It is well-established that "a product feature is functional and cannot serve as a trademark "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix*, 532 U.S. at 32 (internal quotations omitted). Although functionality is a factual question, "the bar for functionality is so low that it can often be decided as a matter of law[.]" *Arlington Specialties v. Urban Aid, Inc.*, 847 F.3d 415, 420 (7th Cir. 2017). To determine whether a feature is functional, courts look to the following five factors:

> (1) the existence of a utility patent, expired or unexpired, that involves or describes the functionality of an item's design element; (2) the utilitarian properties of the item's unpatented design elements; (3) advertising of the item that touts the utilitarian advantages of the item's design elements; (4) the dearth of, or difficulty in creating, alternative designs for the item/s purpose; [and] (5) the effect of the design feature on an item's quality or cost.

*Georgia-Pacific*, 647 F.3d at 727-28 (quoting *Specialized Seating, Inc. v. Greenwich Indus., LP*, 472 F. Supp. 2d 999, 1011 (N.D. Ill. 2007)). A utility patent, in particular, has "vital significance" in assessing functionality. *TrafFix*, 532 U.S. at 29 ("[A] utility patent is strong evidence that the features therein claimed are functional."). As the Seventh Circuit explained, a utility patent is an "excellent cheat sheet" in assessing functionality because "any design claimed in a patent is supposed to be useful." *Jay Franco*, 615 F.3d at 857. Accordingly, evidence of functionality based on a prior patent "adds great weight to the statutory presumption that features are deemed functional until proved otherwise by the party seeking trade dress protection." *TrafFix*, 532 U.S. at 29-30. "Where the expired patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device." *Id.* at 30.

## II.  CAI's Motion for Summary Judgement of Invalidity

CAI seeks to invalidate Flexco's registered and common law trade dress on the ground that they are functional, and invalid as a matter of law. (R. 71, Def.'s Mot. Summ. J.) According to CAI, Flexco admitted as much in its prosecution of its '326 and '848 registrations, and in any case functionality of the Flexco marks is evidenced by the claims and disclosures of the '308 patent, the features touted in Flexco's advertising, and internal records from Flexco showing testing and evaluations of the beveled scalloped edge. (R.71-1, Def.'s Mem. Supp. Mot. Summ. J. at 12-14.) Flexco opposes the motion, arguing that the functional benefits to which CAI points do not arise from the shape of the fastener, but instead from other features. (R. 83, Pl.'s Resp. at 8-11.) According to Flexco, CAI misconstrues both the '308 patent and Flexco's advertising statements to make it seem like the entirety of the fastener shape is functional, when instead its

marks and alleged trade dress only accommodate useful functions of the fastener or are ornamental and source-indicating. (*Id.* at 3-5, 12-13.) Indeed, Flexco says, the '308 Patent is simply a red herring, as it was only for a different, smaller fastener, and does not apply to the configurations it asserts here. (*Id.* at 12.) Relying heavily on the availability of alternative designs and its asserted reason for the scallop in its smaller fasteners, Flexco argues it has provided sufficient evidence of a factual dispute regarding functionality to withstand the present motion. (*Id.* at 12-13.)

The Court begins with consideration of whether the '308 Patent disclosed the alleged trade dress features as functional, or whether their reference appears just incidentally. According to CAI, the '308 Patent describes the functional benefits of Flexco's beveled scalloped edge. (R.71-1, Def.'s Mem. Supp. Mot. Summ. J. at 6-7, 12-14.) According to Flexco, the '308 Patent does not read on its trademark shapes but only applied to its smaller fastener with teeth, the R2, and any utility of the "leading edge" in its patent refers only to the fastener's outermost tips ("shoulders") and not its entire edge ("mustache") or interior shape ("smile"). (R. 83, Pl.'s Resp. at 3-5, 12-13; R. 95, Pl.'s Mot. Strike or Surresp. at 3-5.) Flexco depicts these features like so:





(R. 83, Pl.'s Resp. at 4-5.)

In support of its position, Flexco emphasizes that the drawings of the '308 Patent, and in particular Figure 2 of the patent, do not show the center, curved smile section of the fastener as beveled. (R. 83, Pl.'s Resp. at 12.) It argues that even as to the outline of the fastener, or its edge (the mustache), beveling is not claimed by the patent but rather disclosed as prior art. (*Id.* at 12-13.) According to Flexco, its larger fasteners were only scalloped to "look good," as opposed to its smaller fastener, which was scalloped for the specific purpose of enabling it to fit with a larger five-rivet applicator tool. (*Id.* at 13.)

The focus of the Court's review of the '308 Patent, however, is not limited to whether it only covers a particular fastener, but rather, whether it discloses the utilitarian advantages of the particular features Flexco now alleges as trade dress. *See TrafFix*, 532 U.S. at 30-31. At issue in *TrafFix* was a claim of trade dress infringement of the design of plaintiff's dual spring mechanism for use in outdoor signs that had been the subject of a prior utility patent. *Id.* at 25-26. Notably, the fact that the dual spring device as disclosed in the patent looked "very different" from the plaintiff's purported trade dress did not affect the Court's analysis in finding the feature functional. *Id.* at 30. Instead of focusing on whether the product fell within the terms of the prior patent, the Court focused on the utilitarian aspects of the dual spring feature and whether it

14

served the same purpose as in the patented design. *Id.* at 32. Similarly in *Jay Franco*, the Seventh Circuit rejected an argument that a prior patent for a similar product did not trigger the *TrafFix* presumption of functionality where the product would not have infringed on the prior patent. *See Jay Franco*, 615 F.3d at 858. As the Seventh Circuit explained, "[f]unctionality is determinized by a feature's usefulness, not its patentability or its infringement of a patent." *Id.*

Viewing the '308 Patent through this lens, the Court concludes that it discloses the utilitarian advantages of the features Flexco asserts as trade dress. The claims of the patent cover the scalloped leading edge described in the specification. (R. 83-1, Pl.'s Resp. Def.'s SOF ¶ 15; R. 71-4, '308 Patent col. 12, lns. 24-33.) The specification discloses the functional advantages of beveling for "improved belt gripping and for a lower lead-in profile." (R. 71-4, '308 Patent col. 10, ln 18-22.) The disclosure is not limited to a portion of the edge, but instead explains that "the outboard edges **44** and **46** of the present two rivet fastener **14** are similarly beveled for biting into the belt carcass." (*Id.* at col. 10, lns 22-24.) In turn, Numbers 44 and 46 are described in the '308 Patent as the "scalloped outboard edge **46**," and the "outboard edge **44** of the upper plate **24** can be similarly scalloped." (*Id.* at col. 10, ln 31-39, 45-46.) The '308 Patent also discloses the functional advantage of scalloping, so that "there is less plate material spaced from the rivet apertures **32** such as if the edge **46** extended straight across between the outer peaks of the outer curve sections **88**," as well as "the bite thereof . . . is improved," as is the "lead in profile for being engaged by scraper blades that clean the belt." (*Id.* at col. 10, ln 40-49.) While the '308 Patent claims that the scallop allows a two-rivet fastener to be inserted into a five-rivet fastener applicator as Flexco emphasizes, it also claims that the scallop "reduce[s] the amount of plate material spaced from the apertures so that with the fastener riveted onto the belt end, the

contoured edge bites into the corresponding belt surface for a lower profile for the fastener and additional belt griping and tensile force resistance." (*Id.* at col. 12 lns. 27-38.)

Flexco's arguments notwithstanding, the express language of the patent makes clear that neither its scope nor the functional benefits described therein are limited to a two-rivet fastener. For example, independent claim 1 has no limitation on the number of rivets, while dependent claim 4, which depends on claim 1, has the additional limitation of a "two-rivet fastener." (*Id.* at col. 11, ln 49-col. 12, ln 14, col. 12, ln 33-38.) *See Liebel-Flarshhein Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) ("As this court has frequently stated, the presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim."). Second, the patent specifically explains in the summary of the invention that "[w]hile the hinged fastener described herein has two rivets and two teeth, it will be recognized that different numbers and types of fastener members . . . can be utilized. Thus, belt fasteners using more than two rivets . . . will still fall within the purview of this invention." (R. 71-4, '308 Patent at col. 3, lns. 13-20.) Similarly, the fact that the drawings depict a fastener with two rivets does not limit the disclosures of the patent, but instead demonstrates only a preferred embodiment. (*Id.* at col. 5, lns. 47-48 ("[T]he rivet-hinged fasteners 14 herein preferably only utilize two rivets.").)

Moreover, neither Mr. Westphall nor Mr. Musil's opinion as to what the patent teaches can override its plain language. *See, e.g., Howmedica Osteonics v. Wright Med. Tech.*, 540 F.3d 1337, 1346-47 (Fed. Cir. 2008) (inventor testimony as to intent is irrelevant to claim construction); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 983 (Fed Cir. 1995) (*en banc*) (patentholder's opinion on claim construction that conflicts with plain language of patent does not create a question of fact). (*E.g.*, R. 71-4, '308 Patent at col. 12 lns 24-39.) Because the

'308 patent discloses the utilitarian advantages of the features Flexco claims as trade dress, it is strong evidence that those features are functional.

This strong evidence of functionality is bolstered by Flexco's own advertisements touting the benefits of its beveled scalloped edge fasteners. *See Jay Franco*, 615 F.3d at 859. Flexco's marketing materials declared, "The scalloped design contributes to improved fastener profile resulting in increased compatibility with belt cleaners and improved cleaner-tip wear." (R. 83-1, Pl.'s Resp. Def.'s SOF ¶ 24.) Flexco marketed its fasteners as featuring a "Low-profile Scalloped Edge ™ design that reduces hang-ups on cleaners, pulleys, etc." (*Id.* ¶ 26.) Flexco specifically noted, "The patented Scalloped Edge provides for a lower fastener profile to extend belt splice life and reduce exposure to belt cleaner backs and other conveyor components." (*Id.* ¶ 27.) These are the same functional benefits that are disclosed in the '308 Patent. Notably, Flexco's advertisements did not distinguish what Flexco now calls the shoulders or smile from the rest of its leading edge or attribute functionality to anything other than its shape. (*E.g., id.* ¶¶ 24-27.) Instead, the functionality of the features Flexco now asserts as trade dress is "unequivocally linked to [the] functional benefits" promoted in Flexco's advertisements. *See Georgia-Pacific*, 647 F.3d at 730.

Further, Flexco acknowledged these same benefits both in internal communications and in sworn declarations submitted to the USPTO in pursuit of its trademark registration. (*Id.* ¶¶ 30, 31, 35, 38.) In specific response to the question of whether the "shape of the goods contribute[s] to the quality of the goods," Mr. Westphall declared: "Yes, the overall shape of the goods contributes to the quality of the goods as it reduces the fastener's exposure to cleaner blades, skirt rubber and return idlers. The overall shape also allows for reduced wear and tear on the fastener, which extends the life of the splice to maximize belt availability." (*Id.* ¶ 31; R. 71-15,

17

Westphall June 11, 2015 Decl.) As with its advertising, no distinction was made as to any components of the overall shape. Instead, Mr. Westphall asserted then, as Flexco does now, that the availability of alternative designs to achieve the same function defeats a finding of functionality. (R. 71-15, Westphall June 11, 2015 Decl; R. 83, Pl.'s Resp. at 7, 11.)

The problem for Flexco is that the availability of alternative designs to achieve the same function as its beveled scalloped leading edge fails to create a factual issue on functionality once the asserted feature is demonstrated to be functional. *See, e.g., Specialized Seating, Inc. v. Greenwich Indus., LP*, 616 F.3d 722, 727 (7th Cir. 2010). Instead, as the Seventh Circuit explained, the availability of alternatives in such a situation demonstrates that "*all* of the designs are functional, in the sense that they represent different compromises" to a problem. *Id.*

This case is not like *Bodum USA, Inc. v. A Top New Casting, Inc.*, a case upon which Flexco heavily relies. *See Bodum USA, Inc. v. A Top New Casting, Inc.*, No. 16 C 2916, 2017 WL 6626018 at *9 (N.D. Ill., Dec. 28, 2017). In *Bodum*, the Court found a question of fact precluding summary judgment where the plaintiff claimed trade dress protection for the "overall design" of its coffeemaker which had never been the subject of a utility patent, despite that certain individual features included in the claimed trade dress had been patented and were functional. *Id.* at *9. To the contrary here, the utility of the very features Flexco asserts as trade dress is demonstrated by Flexco's prior patent, its advertising, and its statements to the USPTO. Where functionality is established, the Court need not consider whether other design possibilities are available. *TrafFix*, 532 U.S. at 33; *Arlington Specialties*, 847 F.3d at 420.

Flexco's reliance on the '749 Patent also does not raise a triable issue since it does not reflect the same features Flexco asserts as trade dress. While a design patent "may be some evidence of non-functionality," there must be "identity between the design patent and the

18

asserted trade dress configurations. *In re Becton, Dickinson & Co.*, 675 F.3d 1368, 1375 (Fed. Cir. 2012); *see also Georgia-Pacific*, 647 F.3d at 729 ("[L]ike a trademark, design patents do not preclude a finding of functionality.").

As the Seventh Circuit recently reiterated, "Under *TrafFix Devices, Specialized Seating, and Georgia-Pacific*, the right question is whether the design feature affects product quality or cost or is 'merely ornamental.'" *Arlington Specialties*, 847 F.3d at 420. Here, Flexco answered that question when it acknowledged that its leading, beveled scalloped edge contributes to the quality of its product. (R. 83-1 Pl.'s Resp. Def.'s SOF ¶ 31; R. 71-15, Westphall June 11, 2015 Decl.) *See TrafFix*, 532 U.S. at 32-33. ("[A]product feature is functional, and cannot serve as a trademark, if it is essential to the use of purpose of the article or if it affects the quality of the article." (internal quotation omitted)). Neither Mr. Musil nor Flexco's president and CEO Richard White's testimony that the scallop was chosen to be ornamental and source-indicating raises an issue of material fact from which a reasonable jury could return a verdict in Flexco's favor. "[A] functional aspect of the design cannot be trademarked, even if it also . . . identifies the product's source." *Eco Mfg. LLC v. Honeywell Int'l, Inc.*, 357 F.3d 649, 651 (7th Cir. 2003).

On this record, Flexco is unable to carry its heavy burden to come forward with evidence showing a triable issue of fact that its asserted trade dress is non-functional. *See TrafFix*, 532 U.S. at 29. Accordingly, Flexco's trademarked shapes and alleged common law trade dress are functional and invalid under the Lanham Act. CAI's motion for summary judgment is therefore granted. Absent a protectable claim under the Lanham Act, Flexco's common law and state law claims necessarily also fail.

### III. Flexco's Motion for Partial Summary Judgment

Because the Court grants CAI's motion for summary judgment of invalidity, which disposes of Flexco's complaint, its motion for partial summary judgment on CAI's declaratory judgment counterclaim and affirmative defense of unclean hands (R. 80, Pl.'s Mot. Partial Summ. J.) is denied as moot.

### CONCLUSION

For the foregoing reasons, Defendant/Counter-Plaintiff CAI's motion for summary judgment (R. 71) is GRANTED, and Plaintiff/Counter-Defendant Flexco's motion for partial summary judgment (R. 80) is DENIED as moot. Flexco's motion to strike certain portions of CAI's reply in further support of its summary judgment (R. 95) is DENIED. Defendant/Counter-Plaintiff's CAI's remaining counterclaims are DISMISSED as moot. The clerk of court is DIRECTED to enter final judgment in favor of Defendant/Counter-Plaintiff CAI and against Plaintiff/Counter-Defendant Flexco on Plaintiff's complaint.

ENTERED:

Chief Judge Rubén Castillo
United States District Court

**Dated: May 2, 2019**